1    **ROBERT M. VANTRESS, ESQ. (SBN 106442)**
     **VANTRESS LAW GROUP**
2    **900 E. Hamilton Ave., Suite 100**
     **Campbell, CA 95008**
3    **Telephone:  (408) 905-6501**
     **Facsimile:  (408) 583-4000**
4    **RVantress@Vantresslaw.com**

5    **Attorneys for Plaintiff, J.J, a minor**

6

7

8                 **UNITED STATES DISTRICT COURT**

9

10              **NORTHERN DISTRICT OF CALIFORNIA**

                  **SAN FRANCISCO DIVISION**

11

12

13    J.J., a minor, by and through his Guardian *Ad*    )    Case No. C 08-05376 JW
     *Litem*, Robert M. Vantress    )
                               )    **SECOND AMENDED COMPLAINT FOR**
14                  Plaintiff,    )    **DECLARATORY AND OTHER RELIEF**
                               )    **FOR CIVIL RIGHTS VIOLATIONS**
15         v.    )
                               )    <u>**JURY TRIAL DEMANDED**</u>
16    OAK GROVE SCHOOL DISTRICT, a public    )
     entity school district, EMANUEL (MANNY)    )
17    BARBARA, an individual, KATHERINE    )
     BAKER, an individual, RICHARD    )
18    HOLTERMAN, an individual, TAMRA UNCK,    )
     an individual, RISA QUON, an individual,    )
19    NANCY LETTENBERGER, an individual,    )
     JACQUELINE ADAMS, an individual, JEREMY    )
20    NISHIHARA, an individual, DIANNE LEMKE,    )
     an individual, DENNIS HAWKINS, an individual, )
21    DEANNA JEAN MOUSER, an individual, and    )
     ATKINSON, ANDELSON, LOYA, RUUD &    )
22    ROMO, a Professional Law Corporation,    )
     Defendants.    )
23                                   )
                    Defendants.    )
24    _____ )

25

26

27

28

1    Plaintiff, J.J. a minor, by and through his Court appointed temporary Guardian *Ad Litem*

2  ("JJ"), alleges as follows:

3  **Introduction - Nature of Claims**

4    1.    This is a civil rights action to recover damages, and obtain declaratory and injunctive

5  relief arising under the civil rights laws and Constitution of the United States and related state laws.

6  JJ, a minor, brings this action against those believed to be responsible for and who participated in or

7  aided and abetted the wrongful deprivation of his civil rights in violation of the Due Process and

8  Equal Protection Clauses of the United States Constitution and other federal laws.

9    2.    The deprivation of civil rights alleged herein arise out of the alleged investigation

10  and/or disciplinary actions by Defendant Oak Grove School District ("The School District") and its

11  agents, officers and employees following an incident of alleged sexual battery that occurred on

12  November 29, 2007 ("Incident") after which JJ was wrongly accused and disciplined.  JJ, an African

13  American, was suspended from Bernal Middle School in The School District ("Bernal School") from

14  November 30, 2007 until February 14, 2008, a period of 76 days, for allegedly forcibly detaining a

15  female student friend of his, and "humping" her from behind, in what the female alleged victim

16  herself said was a joking manner after school, in the presence of the girls' boyfriend and another

17  student.

18    3.    JJ vigorously denied that he committed this act, maintaining that he had only hugged

19  her, as did another boy, at the time.  JJ was ultimately expelled.  He had no prior similar incidents of

20  alleged misconduct, and there was no warning of any kind, nor any attempt whatsoever by Defendants

21  to impose any lesser penalties or to receive counseling.  Most importantly JJ was not even given his

22  rights granted by the U.S. Constitution and the California Education Code to challenge the allegations

23  before any impartial adjudicatory body.  The School District purported to acts as both Judge and

24  Prosecutor, and from the very beginning, believed JJ was guilty of the allegation.  Plaintiff is

25  informed and believes that these wrongful acts were motived in whole or in part by racial

26  discrimination by one or more of the Defendants sued herein.

27    4.    Although JJ denied the allegations, and still does, his 76 day suspension followed by

28  permanent expulsion was long enough and serious enough to require careful protection of the accused

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1  before such punishments could be imposed.  Expulsion is the "most drastic measure a school district

2  may take in response to student offenses" and which, according to the California Attorney General

3  Dan Lungren, "must be exercised with great care." 57 Ops.Cal.Atty.Gen. 439, 441 (1974).  As such,

4  JJ was denied an evidentiary hearing to determine his guilt or innocence.

5       5.     JJ was in fact expelled for all practical purposes from Bernal, his school of choice,

6  under the School's "Zero Tolerance" Student Behavior Policy ("Zero Tolerance Policy"), and without

7  compliance with the California State Education Code and applicable federal laws, including The Due

8  Process Clause.  This policy, and the manner in which it was implemented in this case, left no

9  discretion to The School District to do anything other than what it purported to do.  JJ does not

10  question the authority and need for the protection of students at Bernal School.  Defendants' authority

11  and discretion to fairly enforce in a non-discriminatory way and with all due process protections

12  afforded by law the student behavior rules that protect students is not being challenged by this action -

13  JJ was in need of such protection also.  Zero Tolerance policies were created as a means to curb

14  violence and dangerous drugs on schools.  Nor does Plaintiff challenge The School District's basic

15  right and duty to protect students' safety.

16       6.     The School District's application of the Zero Tolerance Policy here was unfair, illegal

17  and discriminatory and violated the most fundamental principles of due process.  Defendants were

18  required to comply with federal laws, including the Due Process Clause, in doing so.  Defendants

19  used the supposed need for protection of the female student involved in the Incident, when she did

20  not even ask for such protection, as a pretext to commit the illegal acts alleged herein, when she was

21  not in fear of JJ and did not ask that JJ be removed from Bernal School.  Defendants intended to

22  "make an example of JJ" by demonstrating to students that there would be "zero tolerance" for any

23  sort of alleged bad behavior, however childish or boorish, if it was a technical violation of its Zero

24  Tolerance Policy rules. In doing so, Defendants violated JJ's rights as an accused student, who

25  required an objective and unbiased adjudicatory body to assess whether he committed the acts of

26  which he was accused and other Due Process.  The punishment was substantively unconscionable,

27  shocks the conscience, and violated substantive Due Process.

28

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

7.     The punishment here, if there was to be any at all, should have fit the crime; it didn't. Alternative forms of lesser discipline legally had to be considered to correct any improper behavior; they weren't.  Neither the District nor its officials acting in their official or individual capacities could discriminate against the accused on the basis of his race.  They did.

8.     The Due Process Clause protects a student's property interest in a public school education. Arbitrary, capricious, and unreasonable discipline undermines the interest in protecting student safety by fostering an environment of distrust by students and parents towards school officials acting arbitrarily, and is illegal.  A student expelled for violating a school's "Zero Tolerance" Policy may have an action against the school board for denial of substantive due process when it is applied in a manner that eliminates discretion by the governing officials to rationally discipline minor violations. *See, e.g., Seal v. Morgan*, 229 F.3d 567 (6th Cir. 2000).  As the California Attorney General concluded, "[a] finding under subdivision (b)(1) of section [Education Code] 48915 that does not take into account individualized circumstances may deny the pupil's right to due process."  80 Ops. Cal. Atty.Gen 347 (1997).  The School District failed to take JJ's individual circumstances into account and failed to consider whether "other means of correction failed to bring about proper conduct."  Calif. Education Code § 48900.5.  The School District also had no evidence that, due to the nature of the act, the presence of the pupil caused continuing danger to the "physical safety" of the pupil or others.  Such finding was necessary to impose suspension or expulsion here.

9.     As the California State Department of Education ("CDE") has reported, when cautioning the public and educators about abuses of such Zero Tolerance laws, "Relatively trivial incidents in a school setting (minor fights, possession of organic cough drops) that receive media attention have given the overall impression that local practice extends zero tolerance beyond its original intent, and school officials are being warned that zero tolerance policies will not stop tragic school shootings like those that occurred in Columbine, Colorado and elsewhere. Additionally, a policy that does not allow school administrators' discretion or consideration may be ruled by the courts as arbitrary and capricious and found to be in violation of a student's due process rights."  See CDE Warning, published on The Internet at http://www.cde.ca.gov/ls/ss/se/zerotolerance.asp.

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

10.     The CDE also has reported that a zero tolerance study conducted by the Civil Rights Project at Harvard University states that, in addition to the risk of students being unfairly punished, a disproportionate number of minority students are being affected by zero tolerance policies. For example, the report states that data collected from South Carolina shows black students accounted for 61 percent of disciplinary code violations, even though they make up only 42 percent of public school enrollment" *Id.*, citing "Opportunities Suspended: The Devastating Consequences of Zero Tolerance and School Discipline Policies," a Report by the Advancement Project and the Civil Rights Project, Harvard University, 2000.  This report stated that its research and that of the United States Department of Education, determined that public school administrators no longer rely on literal interpretations of states' and districts' zero tolerance policies and overzealously promote safety, inventing creative interpretations of the laws and using them to suspend and expel children based on relatively minor offenses. The report concluded that "Minority students are disproportionately disciplined, with African Americans suspended and expelled at much higher rates than whites within the same schools. According to findings from the U.S. Department of Education, zero tolerance policies are more likely to exist in predominantly African-American and Latino school districts."

11.     The Civil Rights Project Report offered the following recommendations for administering "zero tolerance" discipline policies:

(a)     Monitor disciplinary referrals and keep careful records to ensure that teachers do not overreact or unfairly single out students. Teachers who engage in such practices should be required to take professional development courses in classroom management, child development, and multicultural human relations.

(b)     Require training in classroom management and behavioral issues, including familiarity with legal requirements and their fairness.

(c)     Establish a minimum number of staff development days devoted to classroom management, guidance techniques, and conflict resolution; the classroom management plan should relate to the seriousness of school discipline issues and should be reviewed periodically

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

(d)     Develop in-school suspension programs to keep students on track with schoolwork and provide counseling, including sessions about behavior modification and conflict resolution. Recent reductions in counseling and social work budgets in many districts should be reversed.

12.     JJ is informed and believes that The School District did not heed any of these recommendations.  Rather, it retained an outside attorney, Defendant Mouser, who is believed to have led the charge and counseled The District to violate Plaintiff's civil rights.  She is believed to have recommended the illegal conduct from the moment she became involved, which was very near the incident itself.  Plaintiff is informed and believes that she caused or helped The District overzealously pursue expulsion of all students engaging in alleged violations of the Student Handbook, even minor violations, and without determination of whether alternative means of discipline or behavior modification would correct the student conduct, and against all alleged student offenders, even for minor offenses, to direct the School District's handling of the incident.  Her participation led to the intentional manufacturing of false evidence and had the purpose and/or effect of discriminating against African Americans generally, and JJ in particular.

**Jurisdiction and Venue**

13.     This Court has original jurisdiction of the subject matter for each of the claims arising out of the federal laws pursuant to 28 U.S.C. §§ 1331, 1343(a) and 1985.  The Court has supplemental jurisdiction over JJ's state law claims pursuant to 28 U.S.C. § 1367 and 1338(b).

14.     Venue is proper in this district by virtue of 28 U.S.C. § 1391(b) in that the wrongful acts occurred in and arose in this District, Defendants reside here, and because Defendants' wrongful acts caused injury in this District.

**The Parties**

15.     JJ is a minor individual residing in this District.  JJ was a student at Bernal School and was deprived of his civil rights which caused him injury and was a victim of the wrongful acts alleged herein.

16.     JJ is informed and believes that Defendant Oak Grove School District ("School District") is a school district formed under the laws of the state of California and is a local agency

1    charged with the duty to provide JJ and other students a free public school education, that School

2    District was, at all relevant times, acting by and through its governing Board of Trustees, the

3    Superintendent and its other agents, officials and employees, resides in this District, and owns and

4    controls Bernal School.

5            17.    JJ is informed and believes that  Defendants Emanuel (Manny) Barbara, Katherine

6    Baker, Richard Holtermann, Tamra Unck, Risa Quon and Nancy Lettenberger ("School Officials")

7    were, at all times relevant, individuals residing in this District acting as in their official capacity as

8    government or school officials, employees and/or agents somehow affiliated with The School

9    District, and also acted in their own personal capacities.

10           18.    JJ is informed and believes that  Defendants Jacqueline Adams, Jeremy Nishihara,

11   Dianne Lemke and Dennis Hawkins were, at the relevant times, individuals residing in this District

12   acting in the official capacity as government or school officials, employees and/or agents affiliated

13   with The School District appointed as members of The School District's Board of Trustees ("Board

14   Members"), and who voted on June 24, 2008 to adopt and ratify the prior illegal and wrongful acts or

15   omissions alleged herein of the remaining defendants and also acted in their own personal capacity.

16           19.    JJ is informed and believes that  Defendant Deanna Jean Mouser ("Mouser") was, at

17   all times relevant, an individual residing in this District employed by Defendant Atkinson, Andelson,

18   Loya, Ruud & Romo, a Professional Law Corporation, doing business in this District ("Law Firm"),

19   and that neither Mouser nor Law Firm were an employee of The School District, but were retained by

20   The School District as private attorneys, as independent contractors, to provide legal services to The

21   School District.  As such, Mouser directed The School District in the wrongful acts complained of

22   herein, and thus was acting under color of state law even though she was a private attorney and not an

23   employee of The School District.

24           20.    Specific details of each defendant's participation in the wrongful acts are stated below.

25   JJ is informed and believes that each of the individually named defendants either personally engaged

26   in the wrongful acts alleged herein, or are legally responsible for the wrongful acts alleged.  The

27   individual defendants herein, sued in both their personal and official capacities, each personally

28   participated or subjected JJ to a deprivation of his civil rights and the other wrongful acts stated

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1  herein, or caused JJ to be subjected to such deprivations, i.e., by either performing an affirmative act,

2  participating in another's affirmative wrongful act, or omitted to perform an act legally required of

3  him or her, which omission caused the deprivations alleged herein, or are otherwise legally liable for

4  the wrongful acts or omissions alleged herein. Their individual participation, to the extent known at

5  this time is set forth in detail below.

6  **Intradistrict Venue Assignment**

7      21.     The San Jose Division of the Northern District of California is the appropriate division

8  because a substantial part of the events giving rise to JJ's claims occurred in this division and all

9  parties reside here.  This case was transferred to the San Francisco Division because of the transfer of

10  the Honorable James Ware to that Division.

11  **Federal Civil Rights at Issue**

12      22.      At all relevant times, JJ was entitled to protection of his rights and privileges secured

13  by the Constitution and laws of the United States, including the Fourteenth Amendment and the Bill

14  of Rights, including the Due Process Clause and the Equal Protection Clause and other federal laws,

15  including the First Amendment Right To Privacy, and Title IX, which provides, in relevant part, "No

16  person in the United States shall, on the basis of sex, be excluded from participation in, be denied the

17  benefits of, or be subjected to discrimination under any education program or activity receiving

18  Federal financial assistance." 20 U.S.C. § 1681(a). Under Section 1983, an action will lie against a

19  school official based on that official's alleged deprivation of rights conferred on a plaintiff by Title

20  IX.  JJ is informed and believes that The School District receives Federal financial assistance.

21      23.     The Equal Protection Clause of the Fourteenth Amendment commands that no State

22  shall deny to any person within its jurisdiction the equal protection of the laws.  The Equal Protection

23  Clause ensures that "all persons similarly situated should be treated alike.  The Equal Protection

24  clause confers a federal constitutional right to be free from race discrimination at the hands of

25  governmental actors.

26      24.     The California Constitution requires the state legislature to "provide for a system of

27  common schools" and sets forth detailed requirements for those schools. Cal. Const. art. IX, §§ 5, 6.

28  Public education is a fundamental right under the California Constitution.  Because of this fact,

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1  federal constitutional protections for liberty and property rights are implicated under United States

2  Constitution, Due Process Clause.  Moreover, the eradication of discrimination against African

3  Americans, and the linkage of educational opportunities to equalize the economic conditions and

4  limitations affecting African Americans for centuries in America are well recognized as needing

5  federal protection since at least 1954.  Under federal law, public education is of fundamental

6  importance to a free society and to the continued development of democratic values, individual

7  liberty, and an appreciation for cultural diversity in society.  In *Brown v. Board of Education*, 347

8  U.S. 483, 493 (1954), the Court said: "Today, education is perhaps the most important function of

9  state and local governments. [] In these days, it is doubtful that any child may reasonably be expected

10  to succeed in life if he is denied the opportunity of an education." *Id.* at 493. In *Shelton v. Tucker*, 364

11  U.S. 479, 487 (1960), the Supreme Court observed that "[t]he vigilant protection of constitutional

12  freedoms is nowhere more vital than in the community of American schools."

13        25.      Although JJ acknowledges a school district's authority to maintain discipline in the

14  schools and to suspend or expel a pupil for certain misconduct or for refusal or failure to obey certain

15  school rules, the law clearly established that The School District must exercise this authority in a

16  manner that satisfies statutory and constitutional standards for disciplinary proceedings and in a non-

17  discriminatory way.  The United States Supreme Court has declared that disciplinary charges such as

18  suspension or expulsion, if sustained and recorded, could seriously damage the students' standing

19  with their fellow pupils and their teachers as well as interfere with later opportunities for higher

20  education and employment.  It also has declared that such discipline is a serious event in the life of

21  the suspended child.  Thus, it has been accepted as clear that the property interest in educational

22  benefits temporarily denied and the liberty interest in reputation, which is also implicated required

23  that when, as here, a state has established a right to a public education, that right is a property interest

24  that may not be taken away for misconduct without adherence to the Due Process Clause. *Goss v.

25  Lopez,* 419 U.S. 565, 573-6 (1975).  As the Ninth Circuit has reaffirmed,  Public schools are places

26  where impressionable young persons spend much of their time while growing up. They do so in order

27  to receive what society hopes will be a fair and full education-an education without which they will

28  almost certainly fail in later life, likely sooner rather than later.

26.     Plaintiff had the right as a public school student not to be expelled arbitrarily or irrationally.  This law has been clearly established since at least the Supreme Court's decision in *Goss; Seal v. Morgan,* 229 F.3d 567 (6th Cir. 2000).  There was therefore, no qualified immunity for Defendants' actions in this case.

27.     In response to *Goss*, and the Due Process Clause concerns it raised concerning student discipline, the State Legislature amended the California Educational Code several times to ensure that disciplinary actions by schools and school boards comply with The Due Process Clause.  The Education Code § 48900 *et seq* and related provisions are thus rules adopted by the legislature to ensure compliance with federal law, and are imposed on Defendants as a matter of federal law.  The violation of any process or procedure mandated by the Legislature before a suspension or expulsion is permitted are thus also a violation of The United States Due Process Clause.  Defendants' discretion to impose discipline was not only subject to the United States Constitution and its Amendments, but also these rules mandated by the State Legislature.

28.     Such rights included the right to hear live testimony from the witnesses against him so that their credibility could be tested and their testimony weighed against conflicting evidence when their testimony appears readily available and there was no substantial reason why their testimony cannot be produced, to confront and to cross-examine the witnesses at the hearing, and not have the decision to expel based on reports, written statements and the like, where there was substantial conflict in the evidence, the right to a speedy hearing, the right to an unbiased properly designated adjudicatory body, that the decision to expel be supported by substantial evidence, that suspension or expulsion be imposed upon such a finding of guilt of the misconduct charged, and only after the proper open hearing, and then only if it were determined that "other means of correction failed to bring about proper conduct" and that the presence of the pupil at school causes continuing danger to the "physical safety" of the pupil or others.

29.     Although the State of California mandates public School education, and it has adopted and codified Due Process Clause and other requirements in the Education Code, it delegates that function to local school districts such as Defendant School District. In doing so, the State of California created the school districts as political subdivisions and imbued them with a significant

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1  measure of autonomy, such as the ability to levy taxes, issue bonds, or own land in their own name.

2  Cal. Const., art. XIIIB, § 8; Gov. Code, §§ 54240, 54951, 82041 define school district as "local"

3  government agencies. A California school district's governing board may hold and convey property

4  for the use and benefit of the district.  Educ. Code, § 35162.  School districts may sue and be sued

5  independently of the state (Educ. Code, § 35162), and they operate within specific geographical limits

6  rather than statewide.  As a general matter of California law, the state does not have *Respondeat*

7  *Superior* liability for the acts of a school district.

8         30.    In addition, Government Code § 970, which governs payment of judgments against

9  public entities, distinguishes between "the state or any . . . agency of the state claims against which

10  are paid by warrants drawn by the Controller" and a "local public entity." *Id.*, subd. (c).  For purposes

11  of paying judgments, a school district is not considered an agency whose liabilities are paid by

12  warrants drawn by the Controller.  Funds received by school districts are to be paid into the county

13  treasury for the credit of the district Educ. Code, §§ 41001, 41002.  School districts are authorized to

14  raise their own revenues by issuing and selling bonds, with the approval of the electors of the district.

15  California school districts are authorized to impose development charges to finance school

16  construction.  The School District also receives funds from the federal government and from Santa

17  Clara County.  JJ is informed and believes that The School District's own funds, the funds it raises

18  from the federal government and from the County, together with its liability insurance, will be

19  sufficient to cover any judgment rendered in this case, without the necessity of withdrawing any state

20  funds or making the State of California vulnerable to a judgment for damages in this case.

21         31.    The Board of Defendant School District is a policy-making body which has states that

22  it has the complete and final control over local School District matters, subject only to state and

23  federal law and regulations governing the operation of the District, including the rights and privileges

24  identified above.  The Board has adopted and is implementing the "Zero Tolerance" student behavior

25  policy, under which The Board has stated that "the removal of potentially dangerous students from

26  the classroom a top priority." Although it claims that its Policy "ensures fair and equal treatment of

27  all students," it adds that its Policy "requires that all offenders be punished to the fullest extent

28  allowed by law."  Accordingly, The Board instructed its staff to immediately report to the

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1   Superintendent or designee "any incidence of offenses specified in law, Board policy and

2   administrative regulation as cause for suspension or expulsion" and instructed the Superintendent to

3   notify staff, students and parent/ guardians about the School District's "Zero Tolerance Policy" and

4   the consequences which may result from student offenses and also ensure strict enforcement of this

5   policy." Board Policy BP 5144.1.

6       32.   The Board's Policy was allegedly communicated to the general student body present at

7   a meeting before the 2007 academic year by Defendants Quon, Baker and Unck on or about August

8   29, 2007.  The District stated that "Oak Grove School District supports a zero tolerance approach to

9   serious offenses.  Zero tolerance of unlawful behavior is crucial in maintaining an orderly and safe

10  school environment free from harassment, weapons, drugs, tobacco, vandalism and the threat of

11  physical harm."  This Booklet became the contractual obligation of The School Dist., including the

12  following obligations and/or rights: (1) "To remain enrolled in school until graduated or removed

13  under due process conditions as specified in the Education Code;" (2) "To have access to records

14  upon reaching the age of sixteen;" (3) "To be informed of facts and school actions related to their

15  child;" (4) To "suspend and/or expel a student [only] for reasons set forth in Education Code 48900

16  through 48915 and reviewed on pages 16, 17 and 18;" (5) to" transfer a student to a school or

17  program other than their home school in Oak Grove School District for disciplinary reasons [only] in

18  accordance with due process procedures;" (6) to hold "[i]nformation about your child's . . . behavior,

19  or any other personal information shared in confidence" to be "shared only with those employees

20  directly responsible for providing necessary services to your child."

21      33.   The Board also stated that "The Board shall provide for the fair and equitable

22  treatment of students facing suspension and expulsion by affording them their due process rights

23  under the law.  However, Plaintiff is unaware of such measures, or of any appropriate training for

24  school officials carrying out that Policy.  Plaintiff is informed that The Board failed to adopt or

25  implement standards, training, or other measures to in order to instruct and enable staff to protect

26  students accused of serious violations and their rights guaranteed by federal laws, including those

27  described herein.  Although the Board's Policy is facially race-neutral, its failure to design measures

28  to protect accused students, combined with its "Zero Policy" Standard, guaranteed that students

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1   accused of such misconduct will be expelled in violation of the law and that the bias, prejudices or

2   attitudes and stereotypes of individual staff members charged with the implementation of this Policy

3   would subject the accused to a potential miscarriage of justice.  Because of such lack of training and

4   protection, the ability of Defendants Mouser and Law Firm to aid Defendants' civil rights violations

5   and abuse of students and the Zero Tolerance Policy was increased accordingly.

6         34.    The State of California has legislatively determined that "[t]he governing board of any

7   school district may execute any powers delegated by law to it or to the district of which it is the

8   governing board, and shall discharge any duty imposed by law upon it or upon the district of which it

9   is the governing board, and may delegate to an officer or employee of the district any of those powers

10  or duties.  The governing board, however, retains ultimate responsibility over the performance of

11  those powers or duties so delegated." Education Code § 35161.  The Superintendent of Schools of

12  School District, Defendant Barbara, was responsible to the Board of Trustees as the chief executive

13  officer of School District.  As the chief executive officer of the School District, Defendant Barbara

14  was to implement all Board decisions and manage the schools in accordance with law and Board

15  policies. He was expressly declared to be responsible to students and the instructional program,

16  personnel, non-instructional operations, and the community. The School District Board delegated to

17  the Superintendent the power to make decisions concerning internal operations of the District.

18        35.    On or about August 29, 2007, JJ and Defendants entered into one or more written

19  contracts with Defendants in the form of the 2007-2008 Student Behavior and Parent Information

20  Handbook ("Handbook"), which was given to students and their parents at the beginning of the year

21  and was intended to set forth the rights and responsibilities of students, parents, the School District,

22  and its personnel, with regard to student behavior and was to be interpreted and enforced in

23  accordance with The policies of the School District, state laws, including the Calif. Education Code,

24  and federal laws and constitutional protections.

25        **The Incident and Defendants' Response**

26        36.    On November 29, 2007, at about 2:35 p.m., after students finished their last class that

27  day, JJ and three of his friends were joking and talking with each other. The other students were LN,

28  a female student, her boyfriend, RR, and TT.  RR had been walking to homework class when JJ and

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1 | and TT approached. TT pulled LN toward the area underneath some stairs, and he LN began hugging

2 | each other for about 15 seconds. JJ then asked LN for a hug too and she obliged. JJ and LN were

3 | friends and had hugged each other before. JJ was standing in front of LN while he hugged her, and

4 | she was carrying a binder in her hand and wearing a backpack on her back. At this time, Defendant

5 | Holtermann, a teacher walked by and told them to stop and to disburse, believing that they did not

6 | belong in that area. All four of the students complied with his instruction. LN and RR went to

7 | homework class, and neither reported any incident or wrongdoing.

8 |      37.     At approximately 4:30 p.m. on November 29, 2007, about two hours after the alleged

9 | incident, LN and JJ spoke to each other. She did not complain in any way of his conduct towards her

10 | occurring when Defendant Holtermann had come by and told them to disburse. She did not report

11 | any incident to her mother either. Her mother picked her up at about 4:30 p.m. that day. JJ is

12 | informed and believes that Defendant Holtermann is biased and prejudiced against African

13 | Americans and did not like JJ or the other student TT.

14 |      38.     Neither LN nor RR made any complaint against either TT or JJ the following day

15 | either. At some time between 2:30 p.m. on November 29, 2007, and 2:30 p.m. November 30, 2007,

16 | Defendant Holtermann referred all four students for discipline to the Principal, Defendant Baker.

17 | Some time during the afternoon of November 30, 2007, Defendant Holtermann told Defendant Unck

18 | about the incident.

19 |      39.     JJ is informed and believes that Defendant Holtermann wrote out referrals for all four

20 | students at the suggestion of another unknown teacher. JJ is informed that Defendant Holtermann

21 | believed that all four students were guilty of some sort of rule infraction by being present in the area

22 | and issued a referral for discipline. The School District has refused to provide JJ this referral, so that

23 | Defendant Holtermann's referral is in the exclusive possession of Defendants.

24 |      40.     JJ is informed and believes that based on Defendant Holtermann's referral, assistant

25 | Principal, Defendant Unck, called LN in at end of 6th period and told her that Defendant Holtermann

26 | told Defendant Unck "something happened yesterday." She did not ask LN, but stated what she

27 | thought had happened, according to Defendant Holtermann, and then Defendant Unck asked LN

28 | "what had happened to [you] and RR."

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

41.     JJ is informed and believes that Defendant Unck then called RR and TT down to her office.  After informing LN and RR that referrals had been made against them as well as the other two students, Defendant Unck allowed LN, RR and TT to meet together and discuss the matter between themselves.

42.     JJ is informed and believes that at or about this time, on the afternoon of November 30, 2007, Defendants Unck, Holtermann, Mouser and Baker prejudged JJ by forming the conclusion that he had done something wrong, including engaging in criminal sexual assault or battery, which required Defendant Baker to recommend expulsion.  JJ is informed and believes that Defendants Unck, Holtermann, Baker, Mouser, Barbara and Quon became determined at or about this time, and later, with the help of the other defendants, to carry out the School District's Zero Tolerance Policy and to expel JJ and to deprive him of his civil rights including his due process rights.  Defendant Unck then called LN and RR back into her office and interviewed them while Defendant Lettenberger was typing their statements. At this time, LN reported that TT had grabbed her while she was walking with RR to the homework center, after which JJ took her by the arm under the stairs, and began jumping up and down from behind while TT and RR stood by her side and watched while JJ then started humping her, pushing her against the wall, trying to be funny before Defendant Holtermann came by and told everyone to stop and go to class.

43.     JJ is informed and believes that Defendant Mouser became involved in the investigation of the Incident on or above November 30, 2007, and was aware or should have been aware that the acts alleged herein, including the acts of The District and herself, were wrongful and illegal, and represented to JJ's parent on December 7, 2007, that she was the true author of the Zero Tolerance Policy and the Handbook issued by The School District.  Although Defendant Mouser is primarily an employment lawyer, she holds herself out as "recognized as an authority on student discipline, expulsion appeals, and student rights including Constitutional issues [who has] been selected to present workshops on student discipline and expulsion appeals at state-wide education law conferences including conferences hosted by ACSA, CCSESA, and CASCWA."  JJ is informed and believes that Defendant Mouser, from the time she became involved in the Incident, until June 24, 2008, knew or should have known that the acts and omission alleged herein to be wrongful were in

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1   fact illegal, directed and orchestrated such acts, and personally caused and participated in the events

2   which led to the deprivations of civil rights alleged herein

3        44.    Defendant Mouser and The District were in possession of significant evidence that

4   would lead to the reasonable conclusion that JJ did not engage in the act of which he was accused.

5   There were key inconsistencies in the witness statements procured by Defendants Unck and

6   Letterman and there was exculpatory evidence showing that JJ had not engaged in the conduct he

7   became accused of.  Defendants Unck, Holtermann and Baker disregarded such evidence either

8   intentionally or recklessly for the purpose of justifying the predetermined enforcement action against

9   JJ pursuant to the "Zero Tolerance Policy."  Although LN did sign a witness statement stating that "I

10  could feel a little bit of his body part touching me on my behind," Defendant Holtermann said he saw

11  JJ standing in front of LN.  LN and  TT all said that JJ had been giving her a hug.  TT said that JJ had

12  not been "humping" her.  Moreover, LN's own statements and conduct showed that she did not fear

13  JJ in any way, and that he had not harmed her or intended to do anything other than attempt to be

14  "funny."  A proper investigation by unbiased and properly trained school officials should have led

15  Defendants to reject any allegation of misconduct as either unsupported, or at most led to a private

16  admonishment or counseling to all of the four students at this stage.  But Defendants could not allow

17  for such an outcome.

18       45.    The Education Code and The School's Handbook provided that The School District

19  had a mandatory duty to recommend expulsion when it was reasonably determined (after due process)

20  that the accused was "committing sexual battery" as defined in Education Code § 48900(n).

21  Education Code §48915(c)(4).  Education Code § 48900(n) in turn defined "Sexual Battery" by

22  referring to Penal Code 243.4, which required: (1) touching of an intimate part of another person; (2)

23  while that person is unlawfully restrained by the accused or an accomplice; (3) which touching is

24  against the will of the person touched; and (4) which touching is for the purpose of "sexual arousal,

25  sexual gratification, or sexual abuse."  The School District defined "Assault/Battery" as "Action with

26  intent to do bodily harm, willful and unlawful use of force or violence" in the Handbook.  Sexual

27  Assault or Battery (or attempt) was defined as inappropriate touching or conduct of a sexual nature,

28  including touching breasts, buttocks, genitals, or groin.  JJ is informed and believes that at no time

1  did The District ever acquire evidence that JJ engaged in the alleged act "for the purpose of "sexual

2  arousal, sexual gratification, or sexual abuse."

3       46.     After having taken these three partial witness' statements, Defendant Unck then called

4  the police -- even though she was not required to do so – at about 2:30 p.m. on November 30, 2007,

5  before the non-accused witnesses were fully interviewed, before JJ was interviewed, and scarcely

6  after JJ believed that Defendant Holtermann first referred the four students to Principal Baker for any

7  discipline.  JJ is informed and believes from his review of the evidence provided that this report to the

8  Police was made with knowledge of its falsity or in reckless disregard for its truth or falsity.  The

9  Police arrived that afternoon, interviewed the witnesses, including JJ and were unable to determine

10  whether a crime had been committed by anyone, let alone suspect JJ.

11       47.     After the report to the Police, JJ was then interviewed.  At that time, and at all times

12  thereafter, JJ denied "humping" LN, or hugging her from behind, or restricting her movement in any

13  way.  LN's own statement admitted she had hugged JJ from the front.  JJ made no incriminating

14  statements implicating his guilt.  JJ was never found guilty of sexual battery, the only charge

15  Defendant Unck had reported to the Police on November 30, 2007.  On January 29, 2008, after a

16  further investigation conducted by a School District employee approved of by Defendant Barbara,

17  who re-interviewed the witnesses and provided more complete Witness Statements, The School

18  District conceded that such battery had simply not been committed.  The police refused to press any

19  charges.  But, again, Defendants could not accept this outcome, and were determined to prosecute and

20  expel JJ under the "Zero Tolerance" Policy for an acts they knew or should have known he did not

21  commit.

22  **Additional Deprivation of Due Process Leading to Illegal Expulsion**

23       48.     If all that The School District were considering were a short suspension, it would have

24  been able to determine whether JJ committed the act accused with minimal due process concerns,

25  provided that the determination were rational and based on the substantial evidence, after JJ and his

26  family were notified and allowed to provide any information they had.  However, based on their

27  attitudes about JJ and the Zero Tolerance Policy, and their own failure to properly investigate the

28  allegations in an unbiased way, Defendants determined to seek the expulsion of JJ on November 30,

1  2007.  Based on the evidence known during the afternoon of November 30, 2007, Defendants could

2  not rationally have concluded that LN was the victim of such a crime, or that JJ had been the

3  perpetrator.  JJ is informed and believes that the conclusions Defendants reached at that time, and at

4  all times thereafter, were arbitrary, capricious, and based in whole or in part on bias and racial

5  stereotypes concerning African Americans.

6       49.    A suspension from school may, consistent with the Due Process Clause, be imposed

7  for no more than five consecutive school days. Education Code § 48911(a). Yet, from November 30,

8  2007 through December 3, 2007, Defendants removed JJ from all of his classes at Bernal.  JJ was

9  kept in Defendant Baker's office from November 30, 2007 until December 3, 2007.  This constituted

10  a "suspension," defined as "removal of a pupil from ongoing instruction for adjustment purposes.

11  Education Code § 48925.  On December 3, 2007, Defendants sent JJ home suspended on that day; it

12  formally suspended him on December 4, 2007.  By this time, the maximum time JJ could have been

13  suspended, five days, had expired.  Defendants did not purport to extend the suspension until his

14  expulsion hearing until December 14, 2007, ten days too late.

15       50.    Education Code § 48900.5 provides that suspension shall be imposed only when other

16  means of correction fail to bring about the proper conduct.  However, suspension may be imposed for

17  a first offense for certain acts, including causing, attempting to cause, or threatening to cause physical

18  injury.  Suspension also may be imposed for a first offense if the principal or superintendent

19  determines that the student's presence causes a danger to persons or property or threatens to disrupt

20  the instructional process.  Suspension was improper in JJ's case because there was insufficient

21  evidence obtained in a fair and unbiased manner of JJ's guilt of the charge, and because his alleged

22  failure to follow the Handbook or presentation made to him at the beginning of the school year did

23  not constitute a failure of other corrective means, as Defendants later claimed.  Since any student who

24  violates the student conduct policy is necessarily deemed to be unable to correct their behavior, the

25  heavy handed application of Defendants' "Zero Tolerance Policy" had the unlawfully effect of

26  denying JJ's Due Process rights procedurally because Defendants failed to consider other alternatives

27  as required.

28

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

51.     Also on December 4, 2007, Defendant Baker formally recommended JJ for expulsion and immediately determined to keep him on extended suspension past the lawful limit of five days, and held a meeting on December 7, 2007, with JJ and his parents and others and then notified JJ and his parents of this further action on December 14, 2007. This action was clearly unlawful.  An extension of suspension may be granted only if the Superintendent or his or her designee has determined, following a meeting in which the pupil and the pupil's parent or guardian are invited to participate, that the presence of the pupil at the school or in an alternative school placement would cause a danger to persons or property or a threat of disrupting the instructional process.

52.     There was no factual basis for such finding either.  Any decision made was made without any discretion because it was Defendants' intent to carry out a "Zero Tolerance Policy" by automatically removing a student from school until a proper expulsion hearing could be held. Moreover, The Handbook states: "A student shall not be suspended for more than twenty (20) days in one school year unless the student enrolls in or is transferred to another school for disciplinary action. In this case, the student may be suspended for up to thirty (30) days. (Education Code 48903).  JJ was suspended for 76 days, during which time he received no educational instruction.

53.     Because JJ became subject to expulsion on December 4, 2007, as The Handbook states, [after] The Superintendent/designee [] recommend[s] to the Board of Trustees that the student be expelled[,] the due process procedure is initiated.  The expulsion does not become effective until the due process procedures have been completed and the Board of Trustees votes to expel the student."

54.     By law, before he could be expelled for the alleged violation, JJ was entitled to an open evidentiary hearing to determine his guilt or innocence, and requiring all witnesses to appear and testify live, with the right of cross-examination of them.  Under Education Code § 48918(f), the decision of the governing board to expel a pupil "shall be based upon substantial evidence relevant to the charges adduced at the expulsion hearing or hearings.  Except as provided in this section, no evidence to expel shall be based solely upon hearsay evidence."  Under Education Code § 48918(h), relevant evidence may be admitted and given probative effect only if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs.

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

55.     By law and The Due Process Clause, The School District could not legally continue to recommend expulsion after February 7, 2008.  When The School District realized that it did not have sufficient evidence to support the sexual battery charge, it withdrew it on January 29, 2008, and decided not to seek formal "expulsion" against JJ.  JJ is informed and believes that Defendants Baker, Holtermann and Unck and others were against withdrawing these charges.  Once The School District formally withdrew its attempt to seek expulsion, and the charge that JJ had committed sexual battery, it was no longer required to seek expulsion.  Based on this withdrawal, The School District was required by law to readmit JJ to Bernal School.  The Handbook states: "When the school principal recommends to the superintendent or designee that a student should be expelled, a hearing will be conducted before an administrative panel or a stipulated expulsion will be conducted. Recommendations will be made to the Board of Trustees."  This is the only way contemplated under the Education Code, consistent with due process, to determine his guilt or innocence for any discipline other than a short suspension.  JJ never received any such hearing and was never adjudicated guilty of the charges by anyone, let alone in a fair and unbiased process or by a fair an unbiased hearing officer or tribunal after the evidentiary hearing required by The Due Process Clause.

56.     By law, Defendant's right to seek expulsion of JJ expired on February 7, 2008.  Had JJ been found not guilty of the misconduct accused, The School District would have been required to return him to school immediately under Education Code § 48918(e)("[T]he expulsion proceedings shall be terminated and the pupil immediately shall be reinstated and permitted to return to a classroom instructional program, any other instructional program, a rehabilitation program, or any combination of these programs.").  The acquittal of JJ at the hearing cancelled would necessarily have exonerated JJ of any presumed wrongdoing created by Defendants' charges and their dissemination of information leading other students to believe that JJ had been guilty.

57.     On February 7, 2008, JJ and his parents demanded that JJ be returned with school and that his CUM file be expunged of all charges.  Defendants did not respond, nor did they provide his parents access to the CUM file within a reasonable time, in violation of The Due Process Clause, and Education Code §§ 49070 and 48972.  The Due Process Clause required that when an accused student

1   is not found to have engaged in an act requiring an expulsion, or is found not guilty of such act, the

2   student is entitled to be cleared of the charge and his CUM file stripped of any such charge.

3         58.     JJ is informed and believes that on February 8, 2008, Defendant Baker made an

4   announcement to all students and others publicly over the PA system at Bernal School that included

5   the words "a student was molested and the perpetrator was returning because the District caved in."

6   This statement was made by The School District and one or more of its employees, was defamatory

7   and unprivileged and was reasonably understood by all who heard it to be referring to JJ as the

8   perpetrator, and it was false, because LN was never molested, JJ was never accused of molestation let

9   alone determined by anyone to have actually perpetrated such an act.

10         59.     JJ is further informed and believed that Defendants Holtermann, Unck, Baker, Quon

11   and Mouser opposed the return of JJ to school even as of February 8, 2008.  At this time, each such

12   Defendant knew that the female student involved in the alleged incident did not oppose JJ's return to

13   school.  But they decided to continue to deny JJ the ability to return to school, and cause others to do

14   the same.

15         60.     However, despite the absence of actual proof that JJ had perpetrated the acts of which

16   he had been unjustly accused, The School District ignored JJ's parents' demand to return JJ to school

17   and expunge his CUM file of the charges of which he had not been found, and could no longer be

18   found, guilty of.  Instead, The School District "administratively transferred" JJ out of the school on

19   February 14, 2008, 76 days after he was suspended.  This alleged transfer was not permitted under the

20   Education Code because it was not specifically listed as one of the disciplinary measures allowed by

21   the Education Code, there had been no hearing to comply with The Due Process Clause.  In fact, this

22   "administrative transfer" was an expulsion under Education Code § 48925, which defines

23   "expulsion" as the "removal of a pupil from (1) the immediate supervision and control, or (2) the

24   general supervision, of school personnel, as those terms are used in Section 46300."

25         61.     Because of the Due Process Clause concerns in the case of suspensions longer than

26   short suspensions and expulsions, students and their parents are legally entitled to a fair and unbiased

27   open hearing designed to determine whether the accused student actually engaged in the conduct of

28   which he or she is accused, and that hearing must take place shortly after the incident.  *Goss v. Lopez*

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1   (1975) 419 U.S. 565, 573-4 held that The Due Process Clause requires that there be sufficient cause

2   determined through fundamentally fair procedures. The Due Process Clause demands that the

3   administrator who imposes discipline must make a fair and unbiased attempt to determine what

4   happened and if it justifies suspension. *Id.* at pp. 583-584. See *Perlman v. Shasta Joint Jr. College*

5   *Dist. Bd. Of Trustees* (1970) 9 Cal.App.3d 873, 883, 88 Cal.Rptr. 563. The Due Process Clause

6   required that: (1) a suspension may be imposed only by a relatively high level administrator, i.e., the

7   principal, the principal's formal designee, or the superintendent of schools; (2) before imposing

8   suspension, the administrator must be satisfied that he or she knows what happened and that the

9   conduct warrants suspension-in this respect, the administrator must bear in mind the Legislature has

10  expressed a preference that, if possible, misconduct be addressed by means other than suspension; (3)

11  unless the administrator is satisfied that the situation constitutes a clear and present danger to life,

12  health or safety, then the determination whether to suspend may not be made until the student is

13  accorded a conference at which the student is informed of the charges and the evidence, and is given

14  the opportunity to explain or contest the charges; and (4) in reaching a determination, the

15  administrator must remain fair and unbiased. *Thompson v. Sacramento City Unified School Dist.* 107

16  Cal.App.4th 1352, 1363 (2003).

17         62.    After January 8, 2009, The School District continued to maintain that even if JJ had

18  not committed a sexual battery, he was nonetheless presumed guilty, without any actual finding, of

19  sexual battery or harassment. But the School District's withdrawal of this charge necessarily meant

20  that it had determined that JJ had not humped LN from behind, or touched her buttocks with his

21  pelvis, or held LN against her will, as previously assumed, as it was these acts that constituted the

22  charge of sexual battery in the first place. Thus, based on The School District's own withdrawal, there

23  could be no act of sexual harassment either. Moreover, The School District's own rules state that

24  such allegations would be "thoroughly and objectively investigated with the results be communicated

25  to the complainant as soon as practical." JJ is informed and believes that no such investigation was

26  made, nor results communicated, and the School District's own withdrawal of the charges could only

27  mean that, based on the facts previously asserted, there had been no act of sexual harassment that had

28  somehow interfered with LN's ability to engage in the educational process. Even if such harassment

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1   had occurred, the suspension or expulsion (or "administrative transfer") for the period of time JJ

2   suffered was in violation of the School District's own policy, which states that "If the principal

3   determines that unlawful harassment has occurred, the District will take effective remedial action

4   commensurate with the severity of the offense. Appropriate action will also be taken to deter any

5   future harassment."

6        63.    The removal of JJ from Bernal was not only unnecessary because LN did not request

7   it, it created a continuation of the stigma JJ had already suffered, by the disclosure of the allegations,

8   the removal from school for an extended period, and the improper and defamatory announcement of

9   February 8, 2008. Students who had known JJ could only presume that JJ was in fact guilty of a

10   heinous sex crime, when he was not.

11   **Defendants' Participation in and Conspiracy to Engage in the Wrongful Acts and Omissions**

12        64.    Defendants Holtermann, Baker, Mouser and Unck initially, joined later by the

13   remaining Defendants, entered into a civil conspiracy and agreement to violate the civil rights of JJ by

14   performing acts, omissions and conduct under color of state law that: (a) discriminated against JJ on

15   the basis of his race in violation of the Equal Protection Clause of the Fourteenth Amendment; and/or

16   (b) deprived JJ of his rights under the Due Process Clause of the Fourteenth Amendment; (c)

17   deprived JJ of his rights under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §

18   1681-1688.

19        65.    In addition to the conduct alleged above, said conspiracy and agreement is evidenced

20   by the fact, inter alia, that said Defendants aided, abetted, approved, ratified and/or deliberately and

21   knowingly failed, refused and/or refrained from intervening in or stopping the fabrication and/or

22   planting of evidence on or against JJ, and/or deliberately and knowingly failed, refused and/or

23   refrained from promptly and accurately reporting such fabrication and planting of evidence to their

24   superiors and/or other appropriate authorities. In the alternative, said Defendants agreed and

25   conspired to: (a) be deliberately indifferent to JJ's well-founded and legitimate complaints of

26   discrimination and violation of their rights, knowing that the other Defendants were determined to

27   expel JJ; and (b) ignore, and/or refuse to address or remedy, JJ's well-founded and legitimate

28   complaints of discrimination and violation of law.

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

66.     In engaging in and performing the acts, omissions and conduct alleged above, Defendants' had an improper motive to enforce Defendants' Zero Tolerance Policy strictly, without regard to JJ's actual guilt or innocence, and to support the biased and discriminatory views of Defendants Holtermann, Unck, Baker and other unknown defendants who prejudged JJ as a person of bad character who needed to be expelled from Bernal School and to make an example of him.  Said motives were influenced by said Defendants Holtermann, Unck, Baker's views about African Americans and/or males in their behavior towards females. Their conduct discriminated against JJ on the basis of his race

67.     Defendants' conduct was clearly unreasonable in light of the known circumstances. Each of the individually named Defendants violated JJ's rights under the Constitution of the United States under color of law and discriminated against JJ on the basis of his race in violation of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, in violation of JJ's Right of Privacy, in violation of JJ's rights under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681-1688, and discriminatory in violation of 42 U.S.C. § 1983.

68.     The individual Defendants sued herein were carrying out and enforcing The Board's Zero Tolerance Policy in a discriminatory fashion based on racial stereotypes and prejudged JJ's guilt based on bias and knowingly and intentionally or with deliberate indifference disregarded the exculpatory evidence.  The decisions to suspend and expel JJ (whether or not it was an "administrative transfer") and to deny the other rights and privileges alleged herein were made by each of the individual Defendants who were either: (1) with respect to policy decisions, if any, functioning as "final policymaker" of The School District implementing and enforcing its Zero Tolerance Policy, or (2) participating in the wrongful acts personally, or causing or directing the other Defendants who engaged in such acts to do so.  The School District is also responsible because the wrongful conduct alleged herein was authorized and was ratified by The Board and The School District, which had actual knowledge of the constitutional violations and discrimination and actually approved of it on or about June 24, 2008.

**Plaintiff's Damages**

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

69.    As an actual, direct, proximate and legal result of the wrongful conduct of Defendants, and each of them, alleged herein, Plaintiff JJ incurred, and is entitled to recover, general and special damages, including but not limited to: (a) past severe physical injuries, severe emotional injuries and distress, medical and other expenses, and significant educational and opportunity detriment; and (b) such damages that each Plaintiff will suffer and incur in the future.  The amount of Plaintiff's compensatory damages is unknown at this time, but exceeds the sum of $75,000.  Plaintiff is also entitled to interest at the legal rate on such damages according to law.

70.    Plaintiff is also entitled to punitive and exemplary damages because Defendants' wrongful conduct was willful, fraudulent, deceitful, malicious and oppressive.

.                                    **FIRST CLAIM FOR RELIEF**

(Declaratory Relief - Against All Defendants)

[28 U.S.C § 2201]

71.    Plaintiff realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 69 above, as though fully set forth herein.

72.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

73.    An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that plaintiff contends that JJ was innocent, or at least not found legally to have engaged in any misconduct with student LN, and was denied his civil rights with respect to any investigation and determination, if any, that was made concerning his guilt or innocence.  Plaintiff desires a judicial determination of these respective rights and duties, and a judicial declaration as to those rights and duties.  A declaratory judgment will serve a useful purpose in clarifying and settling the legal relations in issue.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain JJ's rights and duties and be declared innocent of the charges.

**SECOND CLAIM FOR RELIEF**

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

(Injunctive Relief - Against All Defendants)

74.     Plaintiff realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 69 above, as though fully set forth herein.

75.     Plaintiff has no speedy or adequate remedy to erase the stigma and harm suffered as a result of Defendants' illegal acts and omissions.  Plaintiff is entitled to injunctive relief that Defendants, and each of their agents, servants, employees, attorneys, successors and assigns and all persons in active concert or participation be enjoined and restrained preliminarily and perpetually and permanently from:

        a.     Violating or attempting to violate JJ's civil rights, or denying JJ admission to the school within The School District of his choice, or transferring him away from student LN;

        b.     Publishing, stating, insinuating, contending, or keeping any records in the CUM file of JJ that he engaged in any violation of The Student Behavior Handbook or any other alleged misconduct, or committing any acts calculated or intended to cause anyone to believe that he did.

        c.     Continuing to perform in any manner whatsoever any acts alleged to be unlawful herein.

## THIRD CLAIM FOR RELIEF

(Damages - § 1983 Civil Rights Violations - Against All Defendants)

76.     Plaintiff realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 70 above, as though fully set forth herein.

77.     Defendants' acts complained of herein constitute deprivation of federal civil rights under color of law.  Plaintiff's rights were protected by the Constitution or created by federal statute. Defendants' wrongful acts and omissions were a substantial factor in causing harm to Plaintiff. Defendants, and each of them, were a "person" acting under color of state law.

WHEREFORE, Plaintiff prays for relief as follows:

1.     For declaratory relief and injunctive relief that Defendants, and each of their agents, servants, employees, attorneys, successors and assigns and all persons in active concert or participation be enjoined and restrained preliminarily and perpetually and permanently from:

1         a.      Violating or attempting to violate Plaintiff's civil rights, or denying JJ

2 admission to the school within The School District of his choice, or transferring him away from

3 student LN;

4         b.      Publishing, stating, insinuating, contending, or keeping any records in the

5 CUM file of JJ that he engaged in any violation of The Student Behavior Handbook or any other

6 alleged misconduct, or committing any acts calculated or intended to cause anyone to believe that he

7 did.

8         c.      Continuing to perform in any manner whatsoever any acts alleged to be

9 unlawful herein.

10     2.     For general and/or special damages;

11     3.     For punitive and/or enhanced damages in an amount as the trier of fact may determine

12 for malicious, willful, intentional, deliberate and tortious conduct of Defendants.

13     4.     For prejudgment interest at the legal rate;

14     5.     For litigation costs and expenses, including legal fees;

15     6.     For such other and further relief or as the Court deems just and proper.

16 Dated: July 30, 2010

17                         ROBERT M. VANTRESS
                        VANTRESS LAW GROUP

18

19

20               By:_____//ss//_____
                        Robert M. Vantress,
                        Attorneys for Plaintiff JJ

21

22                       **<u>DEMAND FOR JURY TRIAL</u>**

23     Plaintiff hereby requests a trial by jury on all issues triable of right by a jury.

24 Dated: July 30, 2010

25                         ROBERT M. VANTRESS
                        VANTRESS LAW GROUP

26

27

28               By:_____//ss//_____
                        Robert M. Vantress,
                        Attorneys for Plaintiff JJ

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF - CIVIL RIGHTS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28